DOCKET Nos. 20-CV-4169 & 20-CV-4698

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>FIRESTAR DIAMOND, INC. *et al*.,<br>　　　　　　　　Debtors. | Chapter 11<br>Case No. 18-10509 (SHL)<br>(Jointly Administered) |
| BANK OF INDIA, BHARAT DIAMOND<br>BOURSE BRANCH,<br>　　　　　　　　Appellant,<br>　　　v.<br>RICHARD LEVIN, Chapter 11 Trustee of<br>FIRESTAR DIAMOND, INC., FANTASY,<br>INC., and OLD AJ, INC. f/k/a A. JAFFE, INC.,<br><br>　　　　　　　　Appellee. | No. 20-cv-4169-JGK |
| BANK OF INDIA (LONDON BRANCH),<br>UNION BANK OF INDIA (UK) LTD.,<br>RECEIVERS OF FIRESTAR DIAMOND BVBA<br>(on behalf of BANK OF INDIA (ANTWERP<br>BRANCH)),<br>　　　　　　　　Appellants,<br>　　　v.<br>RICHARD LEVIN, Chapter 11 Trustee of<br>FIRESTAR DIAMOND, INC., FANTASY, INC.,<br>and OLD AJ, INC. f/k/a A. JAFFE, INC.,<br><br>　　　　　　　　Appellee | No. 20-cv-4698-JGK |

# APPELLANTS' MAIN BRIEF

**HILL RIVKINS LLP**
45 Broadway, Suite 1500
New York, New York 10006
Tel.: 212-669-0600
Fax: 212-669-0698
*Attorneys for Appellants*
*Bank of India (London Branch);*
*Union Bank of India (UK) Ltd.;*
*Receivers of Firestar Diamond BVBA on*
*Behalf of Bank of India (Antwerp Branch)*

**CONDON & FORSYTH LLP**
7 Times Square, 18th Floor
New York, New York 10036
Tel:  (212) 490-9100
Fax:  (212) 370-4453
*Attorneys for Appellants*
*Bank of India, Bharat Diamond Bourse*
*Branch*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellants certify that they are each subsidiaries of publicly traded corporations as follows: (1) Appellants Bank of India (London Branch), Bank of India (Antwerp Branch), and Bank of India—Bharat Diamond Bourse Branch are subsidiaries of Bank of India, which is publicly traded on the National Stock Exchange of India Ltd. and the Bombay Stock Exchange; (2) Appellant Union Bank of India (UK) Ltd. is a subsidiary of Union Bank of India, which is publicly traded on the National Stock Exchange of India Ltd. and the Bombay Stock Exchange.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . ................................................................ iii

STATEMENT OF JURISDICTION. ....................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW. ..................... 2

STATEMENT OF THE CASE. ................................................................ 3

    STATEMENT OF FACTS. ................................................................ 3

    PROCEDURAL HISTORY. .............................................................. 9

SUMMARY OF ARGUMENT. ............................................................. 11

ARGUMENT. ........................................................................................ 12

    A. THE BANRUPTCY COURT ERRONEOUSLY
       DISALLOWED THE CLAIMS OF LENDERS WHO
       ACQUIRED THEIR RIGHTS TO PAYMENT IN THE
       ORDINARY COURSE OF BUSINESS AND PRIOR TO THE
       PETITION DATE. ........................................................................ 12

    B. THE ISSUANCE OF COMMERCIAL INVOICES TO
       DEBTOR FDI, SPECIFYING PAYMENT DIRECTLY TO
       THE BANKS IN CONNECTION WITH THE BANKS'
       GOOD FAITH EXTENSION OF CREDIT TO THE
       FIRESTAR BORROWERS, CREATED A RIGHT OF
       PAYMENT REGARDLESS OF ANY INVOLVEMENT OF
       THE BORROWERS IN THE FRAUD. ........................................... 19

    C. THE BANKRUPTCY COURT ERRED IN NOT APPLYING
       THE HOLDING OF THE DISTRICT COURT DECISION OF
       *IN RE ENRON (ENRON II)* WHERE THE BANKS WERE
       GOOD FAITH CREDITORS FOR VALUE AND NEVER
       HELD ANY PROPERTY OF THE DEBTOR'S ESTATE. ............... 27

        1. The Applicability of the *Enron II* Analysis. ........................... 28

2.  The Bankruptcy Court's Misplaced Rejection of *Enron II* in
        Favor of *KB Toys II* Led It to Conduct a Flawed Equitable
        Assessment of the Banks' Claims. ............................................31

CONCLUSION. .......................................................................................34

ADDENDUM (11 U.S.C. § 502). ..........................................................36

CERTIFICATE OF COMPLIANCE. .....................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re AMR Corp.*, 610 B.R. 434 (S.D.N.Y. 2019) ................................................. 2-3

*In re Arctic Glacier Int'l, Inc.*,
  2016 WL 3920855 (Bankr. D. Del. July 13, 2016) ...........................................15

*In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162 (3d Cir. 2018)..................................15

*In re Davis*, 889 F.2d 658 (6th Cir. 1989) ...............................................................29

*In re Enron Corp.*, 379 B.R. 425 (S.D.N.Y. 2007) (*Enron II*) ........................*passim*

*In re KB Toys Inc.*, 736 F.3d 247 (3d Cir. 2013) .............................................*passim*

*Longacre Master Fund, Ltd. v. ATS Automation Tolling Systems, Inc.*,
  456 B.R. 633 (S.D.N.Y. 2011), *vacated in part on other grounds*,
  496 Fed. App'x 135 (2d Cir. 2012) ...................................................................30

*In re Metiom, Inc.*, 301 B.R. 634 ...........................................................................16

*In re Motors Liquidation Co.*,
  529 B.R. 510 (Bankr. S.D.N.Y. 2015), *aff'd in part*, 829 F.3d 135
  (2d Cir. 2016)............................................................................................. 15-16

*Parr v. United States*, 351 U.S. 513 (1956)...............................................................1

*Petitioning Creditors of Melon Produce, Inc. v. Braunstein*,
  112 F.3d 1232 (1st Cir. 1997)............................................................................29

*Zaretsky v. William Goldberg Diamond Corp.*, 69 F. Supp. 3d 386
  (S.D.N.Y. 2014), *rev'd in part*, 820 F.3d 513 (2d Cir. 2016). ...........................13

**Statutes**

11 U.S.C. § 502 ...................................................................................................*passim*

11 U.S.C. § 547 ...............................................................................................16, 18

11 U.S.C. § 550 ...............................................................................................13, 18

11 U.S.C. § 1104 ................................................................................................ 9-10

28 U.S.C. § 157 ...................................................................................................... 1

28 U.S.C. § 158 ...................................................................................................... 1

28 U.S.C. § 1334 .................................................................................................... 1

N.Y. U.C.C. § 2-403 (McKinney) .................................................................. 12-13

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1), in that this is an appeal from a final judgment, order or decree of the Bankruptcy Court.,  The Bankruptcy Court granted the objections of the Chapter 11 Trustee of Debtor Firestar Diamond, Inc., to the claims submitted by Appellants, thereby disallowing and dismissing said claims from the bankruptcy proceedings.  The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. § 157(b)(1) and 28 U.S.C. § 1334(1), as the proceedings therein represented a core proceeding brought under Title 11 of the U.S. Code.  The proceedings in the Bankruptcy Court were commenced by the filing of simultaneous voluntary Petitions for Reorganization by Firestar Diamond, Inc., Fantasy, Inc. and A. Jaffe, Inc., as debtors-in-possession pursuant to Chapter 11 of Title 11 of the U.S. Code.  The order of the Bankruptcy Court from which this appeal is brought [A-1182-1183], dated May 8, 2020, is a final order in that it sustained the objections of the Trustee of Debtor Firestar Diamond, Inc., and disallowed the claims filed by the Appellants against the bankruptcy estate of Debtor Firestar Diamond, Inc., thereby "terminat[ing] the litigation between the parties".  *Parr v. United States*, 351 U.S. 513, 518 (1956).  The Bankruptcy Court's Order is based on a Memorandum of Decision issued on April 22, 2020, and reported at 615 B.R. 151 [A-1166-1181].

1

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the Bankruptcy Court erred and exceeded its authority under 11 U.S.C. § 502(d) by disallowing the claims of Appellants, who are creditors that are not alleged to have engaged in any improper conduct and who are good faith, bona fide purchasers for value and/or held rights to payment from the Debtor prior to the creation of the bankruptcy estate. The applicable standard of review is *de novo*, as this is a conclusion of law. *In re AMR Corp.*, 610 B.R. 434, 444 (S.D.N.Y. 2019).

2.      Whether the Bankruptcy Court erred in its application of 11 U.S.C. § 502(d) by overlooking that the Debtor's acceptance of commercial invoices, pledged by the Debtor's affiliates to the claimants and directing the Debtor to make payments directly to the Appellants, in connection with the Appellants' good faith extension of credit to the affiliates in the ordinary course of business, created a right of direct recovery by the Claimants against the Debtor. Additionally, the applicable standard of review is *de novo*, as this is a conclusion of law. *In re AMR Corp.*, 610 B.R. 434, 444 (S.D.N.Y. 2019).

3.      Whether the Bankruptcy Court erred by not following the Southern District of New York precedent set forth in *In re Enron Corp.*, 379 B.R. 425 (S.D.N.Y. 2007) (*Enron II*). Once again, the applicable standard of review is *de*

*novo*, as this is a conclusion of law. *In re AMR Corp.*, 610 B.R. 434, 444 (S.D.N.Y. 2019).

4.     Whether the Bankruptcy Court erred in its analysis of equitable considerations by conducting an inherently flawed analysis and failing to consider all of the relevant facts and circumstances of the Appellants' dealings with the Debtor and its affiliates. The applicable standard of review is also *de novo* because this is a conclusion of law. *In re AMR Corp.*, 610 B.R. 434, 444 (S.D.N.Y. 2019).

## STATEMENT OF THE CASE

### STATEMENT OF FACTS

Appellants, BANK OF INDIA (LONDON BRANCH) ("<u>BOI-L</u>**")**, RECEIVERS OF FIRESTAR DIAMOND BVBA on behalf of BANK OF INDIA (ANTWERP BRANCH) ("<u>BOI-A</u>"), UNION BANK OF INDIA (UK) Ltd. ("<u>UBI</u>"), and BANK OF INDIA, BHARAT DIAMOND BOURSE BRANCH ("<u>BOI-BDB</u>") (collectively "<u>Bank Appellants</u>" or "<u>Banks</u>"), appeal from a Memorandum Decision and Order of the Southern District of New York Bankruptcy Court disallowing their claims against the Debtor Firestar Diamond, Inc. (hereinafter "Debtor" or "FDI").  The Chapter 11 Trustee, who was appointed to serve as fiduciary and oversee the administration of the Debtor's bankruptcy estate during the pendency of the bankruptcy proceedings, objected to the Bank's claims.  The Debtor was an importer and wholesaler of jewelry products, including

polished diamonds, and was an indirect subsidiary of the Firestar International,

Ltd. group of companies.

On February 26, 2018 (the "Petition Date"), the Debtor, simultaneously with

two of its United States based affiliates, filed a petition under Chapter 11 in the

Southern District of New York Bankruptcy Court.  [A-1-5][1].  According to the

Petition, approximately three weeks before the Petition Date, news reports out of

India alleged that Mr. Nirav Modi, the principal shareholder of Firestar

International Ltd., and certain companies under his control had obtained

unauthorized loans from Punjab National Bank (hereinafter "PNB") in the form of

letters of undertaking used to finance allegedly fraudulent international sales of

diamonds.  [A-15].  The news reports also indicated that certain employees of PNB

had conspired with Mr. Modi to perpetuate the fraud.  [A-15].  The allegations led

to the filing of a criminal complaint in India and the freezing of various assets

linked to Mr. Modi and his companies.  FDI's president and sole director, Mihir

Bhansali, stated in a declaration filed with the petitions that the actions of the

authorities in India had led to the closure of the factories that supplied FDI and its

U.S. affiliates with inventory and impacted the back office support that these

suppliers had provided to FDI.  [A-15-16].  Consequently, Mr. Bhansali stated that

---

[1] "[A-__]" refers to the applicable page in the Appellants' Joint Appendix, filed simultaneously herewith.

the Debtors filed the Chapter 11 petitions "in an effort to preserve the going concern value of their business and effectuate a sale or other transaction that will provide the resources necessary to allow the Debtor' successful brands to continue to thrive".  [A-16].

The transactions at issue involved purchases by FDI of polished diamonds by FDI from three corporations that were indirect subsidiaries of the Firestar International Ltd. group of companies: Firestar Diamond BVBA ("FDBVBA"), Firestar Diamond FZE ("FDFZE"), and Firestar Diamond International Pvt. Ltd. ("FDIPL") (collectively "the Firestar Borrowers").  Years before the Debtor filed for bankruptcy protection, each of the Bank Appellants entered into financing agreements with the Firestar Borrowers. Under those agreements, the Bank Appellants extended credit to the Firestar Borrowers in the form of seller financing and/or purchased the rights to payment of their invoices by the Debtor.  Under the seller financing arrangements, the Firestar Borrowers were authorized to draw funds from their credit facilities with the Bank Appellants in order to provide liquidity during the lead time between shipment of goods being sold and the payment due dates on the commercial invoices issued to the buyers.  [A-716-720, A-767-720, A-853-856, A-1111-1113].  In consideration of the extension of funds on credit, the Firestar Borrowers issued commercial invoices to their customers, such as the Debtor, directing that payment be made directly to the Bank

Appellants, as set out in detail below.  In other circumstances, the Bank Appellants advanced the money to the Firestar borrowers at a slight "discount" and acquired the direct right to receive payment from the Debtor.

Bank Appellant BOI-L is a commercial lender that had entered into a credit facility with FDFZE beginning in as early as 2012.  [A-860-896].  "Receivables" under the BOI-L credit facility were "all debts which are due and payable to the Borrower that have been designated by the Borrower to be charged to the Bank", while "Eligible Receivables" included "export sales receivables [] not more than [] 180 [] days old, and [] which are not the subject of any discount for early payment, not liable to be reduced by any retrospective or other rebate, and are not subject to dispute, set-off or counterclaim".  [A-865-866].  The credit facility was to provide FDFZE with "working capital purposes in the ordinary course of its business".  [A-869].  As security for the extension of credit, FDFZE executed a Deed of Hypothecation pledging to BOI-L "all the tangible and intangible assets of" FDFZE.  [A-950].

BOI-A is also a commercial lender, and entered into a credit facility with FDBVBA,[2] documented in a series of "Sanction of Credit Line" letters renewed on

_____

[2] Bankruptcy proceedings on behalf of FBVBA have been filed in Antwerp, Belgium, also as a consequence of the fraud claims arising in India against Mr. Modi and his companies.  The court appointed Belgian receivers of FDBVBA acting as agent and trustee for both BOI-A and UBI, filed the Proof of Claim under which BOI-A's claim was submitted. To the extent the Proof of Claim filed by the Receivers on behalf of UBI duplicated the separate Proof of Claim filed by UBI itself, the parties made clear to the Bankruptcy Court that the Receivers would deem the

an annual basis.  [A-778-807].  Pursuant to those sanction letters, BOI-A provided

financing to FDBVBA for its diamond trading operations, "against Sales and

Purchase Invoice[s]".  [A-779].  The Credit Line provided that FDBVBA would

"[e]xport diamonds through the intermediary of the Bank on D/A ["Documents

Against Acceptance"] or COD ["Collect on Delivery"] basis to your buyers abroad

and tender the bills drawn by you upon such buyers acceptable to us", and invoices

were eligible for credit only for "buyers on whom a satisfactory report from their

bankers is available".  [A-780].   Each of the FDBVBA/BOI-A Sanction of Credit

Line letters incorporated BOI-A's General Credit Conditions [A-779, A-783, A-

778, A-793, A-798, A-803]; Article 16 of the General Credit Conditions provided

for security by way of pledge for BOI-A's extension of credit to FDBVBA, stating

as follows:

> All documents, securities, goods, valuables and commercial paper that
> the Bank keeps on the Borrower's behalf, shall indivisibly be pledged
> to the Bank by force of law.
> As security for its obligations, the Borrower shall pledge to the Bank
> all its present and future receivables from third parties, including but
> not limited to bills, claims, contracts, engagements, securities,
> investments, deposits with financial institutions, fees and
> commissions, and it shall authorize the Bank to comply with the
> formalities necessary to render such pledge enforceable vis-à-vis third
> parties.  [A-815].

---

UBI portion of Proof of Claim No. 12 withdrawn in favor of UBI's Proof of Claim. [A-722, A-768]

UBI similarly entered into a credit agreement with FDBVBA to provide financing for the diamond trading operations of FDBVBA, specifically "on demand" invoice financing of trade receivables, including sales invoices [A-727]. As security for the financing, UBI and FDBVBA entered into a Pledge of Receivables Agreement whereby FDBVBA granted to UBI a right of pledge over all Receivables of BVBA.   [A-725-772].  UBI had the right to seek payment on any pledged receivables directly from the customers of FDBVBA.  [A-729].

BOI-BDB is also a commercial lender.  BOI-BDB took part in a consortium loan made to FDIPL. As security for the consortium loan, FDIPL granted BOI-BDB the direct right of payment from the Debtor for eight (8) invoices for which the Debtor originally owed payment to FDIPL. The extension of financing and designation of BOI-BDB as direct payee was completed prior to the filing of the Bankruptcy and creation of the Bankruptcy Estate. [A654-709]

At various points in 2017, prior to the February 2018 Petition Date, the Firestar Borrowers drew on the funds on credit that give rise to the Bank Appellants' claims.  Between August 16, 2017, and November 29, 2017, FDBVBA drew $945,984.40 on its credit agreement with BOI-A [A-769-773] and made at least three drawings on its credit facility with UBI totaling $3,168,074.63 [A-716-720].  On November 8, 2017, FDFZE drew the sum of $367,214.60 on its credit agreement with BOI-L.  [A-853-856].  Between September 15, 2017, and

December 15, 2017, FDIPL drew the sum of $723,900.00 under its agreement with BOI-BDB by agreeing that BOI-BDB received the rights to payment of those invoices from the Debtor.  [A-654-709].  Each drawing under the respective credit agreements was made in connection with specific sales of goods to the Debtor by the Firestar Borrowers.  Contemporaneously with each drawing and sale, the Firestar Borrowers issued commercial invoices to the Debtor directing that payment for the various diamond sales at issue be made directly to the Bank Appellants.  [A-745, A-749, A-754, A-822, A-826, A-830, A-954].  In addition, the Bank Appellants were provided with shipping documents, such as air waybills and customs declarations, to demonstrate that the shipments of diamonds sold under the commercial invoices actually were shipped by the Firestar Borrowers to the Debtor.  [A-662-709, A-741-755, A-822-832, A-954-960].

## PROCEDURAL HISTORY

The Bank Appellants duly submitted Proofs of Claim to the claims agents for the Debtor's estate.  [A-430-44, A-488-542, A-560-598, A-620-647].  Thereafter, the Bankruptcy Court issued an order directing the United States Trustee to appoint an Examiner pursuant to 11 U.S.C. § 1104(c) to investigate possible involvement by the Debtors and/or their principals in the bank fraud allegedly committed by Mr. Nirav Modi and the network of trading companies with whom he was associated.  The U.S. Trustee appointed John J. Carney, Esq. to

serve as Examiner on April 19, 2018, which the Court So Ordered on April 20, 2018 [A-32].[3]  Upon application of creditor Punjab National Bank (PNB) [A-35-84], the Court issued an Order pursuant to 11 U.S.C. § 1104(d) directing the U.S. Trustee to appoint a Chapter 11 Trustee to serve as fiduciary and oversee the administration of the Debtor's bankruptcy estate during the pendency of these proceedings, and approved the appointment of Richard Levin to serve as Chapter 11 Trustee (hereinafter "the Trustee") [A-85].  The Examiner ultimately issued a report implicating the Debtor and its principalsin the Modi fraud. [A-245-414].

Based on the Examiner's report, the Trustee sought disallowance of the Bank Appellants' claims, on the grounds that the alleged complicity of the Firestar Borrowers in the fraud rendered voidable any claims that were derived from allegedly fraudulent transactions between the Firestar Borrowers and the Debtor. After receiving submissions from the Trustee and the Bank Appellants and hearing argument on November 18, 2019 [A-1043-1165], the Court issued its Memorandum Decision [A-1166-1181] and Order [A-1182-1183] granting the Objections of the Chapter 11 Trustee to the Banks' claims.  The Banks filed timely Notices of Appeal to the District Court of the Court's Memorandum Decision and order on May 20, 2020 [A-1184-1198].

---

[3] The orders of the Bankruptcy Court authorizing the appointment of the Examiner and confirming the appointment of Mr. Carney were entered on the Bankruptcy Court's docket as Docket Entries 103 and 115, respectively.

# **SUMMARY OF ARGUMENT**

The Bankruptcy Court erred in disallowing the claims of the Bank Appellants based on the alleged fraud of the Firestar Borrowers. The Bankruptcy Court's superficial analysis misconstrued the nature of the transactions under which the Banks' rights to receive payment directly from the Debtor vested. The court below failed to acknowledge that the Banks had extended financing to the Firestar Borrowers for the sale of goods to the Debtor in good faith and in the ordinary course of business, well in advance of the Petition Date. Instead of properly viewing the Banks as good faith purchases for value, the court treated the Bank Appellants as post-petition speculators in distressed trade claims. The court below rejected applicable case authority from this District in favor of inapposite authority from the Third Circuit. The court therefore concluded incorrectly that the alleged fraud of the Firestar Borrowers attached disabilities that ran with the claims and subjected them to disallowance under 11 U.S.C. § 502(d). Because the Bank Appellants never held any property that could be returned to the Debtor's estate or received any preferential transfers of the Debtor, none of the purposes of Section 502(d) would be achieved through disallowance. Moreover, disallowance undermines the Bankruptcy Code's goal of equitable treatment of creditors, by punishing the actual victims of what the court viewed as fraudulent transactions.

# ARGUMENT

### A.   THE BANRUPTCY COURT ERRONEOUSLY DISALLOWED THE CLAIMS OF LENDERS WHO ACQUIRED THEIR RIGHTS TO PAYMENT IN THE ORDINARY COURSE OF BUSINESS AND PRIOR TO THE PETITION DATE

The Bankruptcy Court erred in disallowing the claims of the Bank Appellants.  The Banks extended funds in good faith to assist in the financing of purchases by Debtor FDI and were named as the payees on commercial invoices issued to the Debtor.  Long before the Petition Date, the Firestar Borrowers drew funds from the Banks in exchange for the Borrowers' issuance of commercial invoices directing the Debtor to make payment for its purchasers directly to the Banks.  The Bankruptcy Court gave no consideration to the extent to which the Bank Appellants had entered into transactions that benefited the Debtor in exchange for the Debtor's accepting invoices directing it to make payment to the Banks.  Rather, to justify its application of the alleged misconduct of the Firestar Borrowers against the Banks, the court below mistakenly treated the Banks as if they were merely post-petition speculators in distressed trade claims.  The Banks have not been alleged to have participated in any of the fraud that forms the basis of the Trustee's disallowance application. There is no dispute that the Banks acquired their rights to payment in due course prior to any bankruptcy proceedings and they hold the status of good faith purchasers for value under New York law.

*See, generally,* N.Y. U.C.C. § 2-403 (McKinney) ("A person with voidable title

has power to transfer a good title to a good faith purchaser for value"); *see also*

*Zaretsky v. William Goldberg Diamond Corp.*, 69 F. Supp. 3d 386, 390 (S.D.N.Y.

2014) ("Put otherwise, the rule is meant to protect "buyers in the ordinary course

of business" by making owners—not purchasers—shoulder the financial risk

associated with fraudulent transactions."), *rev'd and remanded on other grounds*,

820 F.3d 513 (2d Cir. 2016).  Therefore, the Bankruptcy Court should have

concluded that no disability attached to these claims, which the Banks held long

before the Petition Date.

Section 502(d), under which the Bankruptcy Court disallowed the Banks'

claims, provides for the disallowance of "any claim of any entity from which

property is recoverable under section 542, 543, 550 or 553".  There has been no

suggestion, let alone contention, that the Banks ever were in possession of any

property recoverable for the bankruptcy estate of FDI.  Nevertheless, the

Bankruptcy Court mistakenly concluded that an alleged disability, based on the

assumed involvement of the Firestar Borrowers in the massive Modi fraud, "ran"

with the claim.  The sole basis for the disallowance supposedly is that the claims

subject to disability were "transferred" to the Bank Appellants.  Such a conclusion

misconstrues the nature of the transactions under which the Banks' rights to

receive payment directly from the Debtor vested and is based on inapposite case authority.

To support its erroneous conclusion that the purported disability generated by the alleged complicity of the Firestar Borrowers in the fraud "ran" to the Banks, the Bankruptcy Court relied on cases that are inapplicable to claims by creditors whose rights to payment arose in the ordinary course of business prior to the bankruptcy petition.  The Bankruptcy Court relied upon authority involving post-petition transfers of claims or assets, where the articulated concern was over speculators seeking to revive otherwise voidable claims.  The primary decision upon which the Bankruptcy Court relied was *In re KB Toys Inc.*, 736 F.3d 247 (3d Cir. 2013) ("*KB Toys II*"). The Third Circuit's concern in the *KB Toys II* decision was the extent to which "a *trade claim* that is subject to disallowance under 502(d) in the hands of the original claimant is similarly disallowable in the hands of a subsequent transferee." (Emphasis added).  As this Court can readily observe, a "trade claim" is a claim in the unpaid debt of a bankrupt company and thus necessarily can only exist after the filing of a bankruptcy petition.  The Court in *KB Toys II* had begun its analysis by summarizing the market for transferring of trade claims as follows:

> Creditors holding claims against an entity who has filed a Chapter 11 petition sometimes face a risky and lengthy bankruptcy process. To avoid this risk and expense, a creditor may look to sell its claim, a practice permitted under the bankruptcy rules.  By selling its claim, a

14

> risk averse creditor can opt out of the bankruptcy process and obtain
> an immediate, albeit discounted, payment on the debt it is owed.
> Claim purchasers buy these claims and hope to receive a distribution
> from the debtor's estate in excess of the price paid.

736 F.3d at 249.  In concluding that such trade claims would be subject to the

disability that applied to the transferor, the Third Circuit emphasized that allowing

the claims after transfer would provide "an original claimant who received an

avoidable transfer [with] an incentive to sell its claim and 'wash' the claim of any

disability".  *Id.* at 252.  Allowing such claims also would discourage the transferor

from returning the property recoverable for the estate if it could instead transfer the

claim for new value.  *Id.*[4]

The other cases cited by the Bankruptcy Court are similarly distinguishable

to the claims of the Banks herein and all involve conduct that post-dates the filing

of the bankruptcy petition.  The court in *In re Motors Liquidation Co.*, 529 B.R.

510 (Bankr. S.D.N.Y. 2015), *aff'd in part*, 829 F.3d 135 (2d Cir. 2016), cited *KB*

*Toys II* in the context of reorganization plan limitations on new tort claims against

---

[4] The Bankruptcy Court also cited to the Third Circuit's decision in *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162 (3d Cir. 2018), where shares in the bankrupt corporation, rather than claims against the estate, were transferred. According to the decision of the bankruptcy court in that litigation, the plaintiffs had purchased their shares in the corporation approximately two years and 10 months after the commencement of the bankruptcy proceedings.  *In re Arctic Glacier Int'l, Inc.*, 2016 WL 3920855, at *2 (Bankr. D. Del. July 13, 2016). The Third Circuit cited to *KB Toys II* to conclude that the transfer of shares in a bankrupt corporation was subject to similar limitations as the transferee of a trade claim.  Nothing in the facts of *Artic Glacier* are remotely analogous to lenders' extending financing in exchange for being named as payees on commercial invoices in the ordinary course of business, prior to the bankruptcy petition.

the reorganized General Motors applying equally to original owners and to subsequent purchasers of used GM vehicles in the secondary markets.  Nothing in the case would suggest an analogy to lenders that extended financing in the ordinary course of business to affiliates of the debtor in exchange for the debtor's acceptance of commercial invoices directing payment to the lenders.

The Bankruptcy Court's reliance on *In re Metiom, Inc.*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003), was similarly misplaced. Like all the other cases cited by the Bankruptcy Court, *Metiom* involved a post-petition transfer.  Moreover, the *Metiom* court made clear that post-petition transfers of claims voidable under the second clause of Section 502(d), which the court below cited and addresses the transfer of a claim by an entity that received a transfer that is avoidable as a preference under Section 547 or a fraudulent transfer under Section 548, requires that the transferor "received an avoidable transfer while it held the claim".  301 B.R. at 642.  In this case, the Bankruptcy Court made no finding that the Firestar Borrowers received any fraudulent transfers when they held rights to payment on the invoices for which the Bank Appellants seek recovery.  In actuality, the Bankruptcy Court could not make such a finding because the invoices at issue were drafted and sent to Debtor FDI directing that payment be made directly to the Banks, not to the Firestar Borrowers.  Consequently, the Firestar Borrowers never

had a right to payment on the invoices, so they could not have received fraudulent transfers from FDI while holding a claim under the invoices.

None of the concerns articulated in the cases on which the Bankruptcy Court relied apply to the claims of the Bank Appellants at issue here.  Unlike the creditors in the cases cited by the Court, each of the Banks acquired their rights to payment (1) directly against the Debtor, (2) in the ordinary course of their business of extending financing to bank customers, and (3) prior to the filing of any Chapter 11 petition.  The Banks' respective rights to payment from Debtor FDI are ***not*** derived from a simple post-petition transfer of a claim, as was at issue in the cases on which this Bankruptcy Court had relied.

Neither the Trustee nor the Bankruptcy Court cited to any precedent in which any bankruptcy court has disallowed a claim on such a basis when the creditor's right to payment from the debtor vested in the ordinary course of business before the filing of a bankruptcy petition, even though this was extensively discussed at oral argument.  [A-1104-1105, A-1124-1125].  The Court's unwarranted extension of 502(d) to reach claims that were acquired by good faith purchasers before the Bankruptcy Petition exceeds its authority and casts aside longstanding New York law applying to good faith purchasers.  The vesting of the Banks' rights to payment occurred ***before*** the Petition Date.  As the court concluded in *In re Enron Corp.*:

17

> At the end of the day, however, there can be no dispute that in limited circumstances, a bad faith transferor may be able to sell its claim to a bona fide purchaser for value, effectively "wash" its claim in the hands of the purchaser, take the proceeds and run, to the detriment of other creditors.  However, the risk of that scenario is outweighed by the countervailing policy at issue, namely the law's consistent protection of bona fide purchasers for value. Enron focuses on the harm that will come to the creditors as a result, but the law protects bona fide purchasers for value, and this context is no different.

379 B.R. 425, 448 (S.D.N.Y. 2007).  The court went on to note that because "the majority of the transfers that were before the Bankruptcy Court were made pursuant to credit-default swap contracts that were executed *pre-petition*, … the claims washing concern simply would not apply to those types of transfers".  *Id.* at 447 n.110 (emphasis in original).[5]  Moreover, such policy considerations form the foundation of multiple sections of the Bankruptcy Code.  For example, the Code excepts from avoidance as preferences certain transfers by the debtor for payments of debt incurred by the debtor in the ordinary course of business, *see* 11 U.S.C. § 547(c)(2), and further protects subsequent good faith purchasers for value who received debtor assets in an otherwise avoidable transfer, *see* 11 U.S.C. § 550(b).  Accordingly, none of the concerns expressed in *KB Toys II* applies to the claims at

---

[5] Judge Scheindlin's decision in *In re Enron Corp.* is discussed in greater detail in Point C below.

issue, and the Bank Appellants' position is in line with the Bankruptcy Code paragraph unlike the Trustee's position.[6]

**B.  THE ISSUANCE OF COMMERCIAL INVOICES TO DEBTOR FDI, SPECIFYING PAYMENT DIRECTLY TO THE BANKS IN CONNECTION WITH THE BANKS' GOOD FAITH EXTENSION OF CREDIT TO THE FIRESTAR BORROWERS, CREATED A RIGHT OF PAYMENT REGARDLESS OF ANY INVOLVEMENT OF THE BORROWERS IN THE FRAUD**

By treating the Bank Appellants as speculators in trade claims, the Bankruptcy Court failed to acknowledge the true nature of the transactions under which FDI became directly liable to the Banks.  The court below overlooked that the Banks' rights to receive payment directly from FDI vested no later than FDI's acceptance of the commercial invoices issued by the Firestar Borrowers.  The issuance of the invoices on which the Banks' claims are based was part of a series of multiparty transactions, in which the Banks extended credit in exchange for being named as the payees on the invoices.  In the case of the claims of BOI-L, BOI-A and UBI, the Firestar Borrowers were obligated to pledge all assets, including receivables, to the Banks in exchange for drawing funds under on their credit agreements.  To execute the pledge, the Firestar Borrowers then issued

---

[6] Further, the Bankruptcy Code's requirement for the return of the avoidable transfer until a disallowable claim is allowed supports the Banks' position that the transactions at issue—for which the Banks have yet to receive payment—are not the type of transactions that should subject their claims to disallowance under Section 502(d).  *See KB Toys II*, 736 F.3d at 252 ("Accordingly, 'any claim' falling into this category of claims is disallowable until the avoidable transfer is returned…[Section 502(d)] ensure[s] equality of distribution of estate assets.").

invoices to FDI that required payment to the Banks' designated accounts, rather than to the Firestar Borrowers.  For the claim of BOI-BDB, BOI-BDB took part in a consortium loan made to FDIPL and FDIPL then granted BOI-BDB, as security for the loan, the direct right of payment from the Debtor for eight (8) invoices for which the Debtor originally owed payment to FDIPL.

BOI-L's right to receive payment from FDI on the invoice issued by FDFZE vested no later than November 9, 2017.  On or about November 8, 2017, FDFZE sold to FDI a consignment of cut and polished diamonds purporting to weigh 474.5 carats.  FDFZE issued Commercial Invoice No. FD-335/17-18, dated 8 November 2017, for the sale of the 474.5 carats, at US$773.71 per carat, for a total invoice amount of US$367,124.60, directing FDI as follows: "Payment to be made Directly to **Bank of India London Branch**" (emphasis in original).  [A-954].  On November 9, 2017, Dubai Customs Export Declaration No. 303-03439455-17 was issued, for export of the shipment from Dubai to New York-JFK.  [A-955].  On that same date, high value goods logistics provider Transguard, the high value handling division of air carrier Emirates Group, issued House Air Waybill No. TG17033969, for a shipment "1 PKG" of "CUT AND POLISHED DIAMONDS, VALUE USD 367,124.60 CTS: 474.50", bearing a gross weight of 0.85 kilograms, on board KLM Royal Dutch Airline flight 641 on 10 November 2017 from Dubai International Airport to New York-JFK Airport.  [A-956].  On or about 9

20

November 2017, FZE initiated the pledge of invoice number FD-335/17-18 for the

diamonds sold to Debtor FDI.  On that date, FZE issued to FDI a letter of exchange

directing FDI to make payment for the full amount of the invoice on or before the

due date directly to BOI-L.  [A-959].  FZE subsequently informed BOI-L of the

sale and drawing of the credit funds by way of letter, which authorized the debit of

FZE's account for the full amount of the invoice plus "the necessary charges".  [A-

958].   FZE's notice to BOI-L also included the routing instructions originating

with Israel Discount Bank in New York, with a maturity date of April 9, 2018.

[A-960].

        The rights of BOI-A to receive payment directly from FDI arose through a

series of three sales of polished diamonds by FDBVBA to FDI.

1. The first sale occurred on or about August 16, 2017, when FDBVBA sold

   polished diamonds to FDI weighing 1,841.74 carats.  FDBVBA issued

   Commercial Invoice No. 111710277P, dated 16 August 2017, at US$513.64 per

   carat, for a total invoice amount of US$945,984.40.  [A-822].  That same date,

   high value goods logistics provider Malca-Amit Antwerp BVBA issued House

   Air Waybill No. 4400264, for a shipment 1,841.74 carats of polished diamonds

   on board Swiss Air flight 789 departing on 16 August 2017 from Brussels to

   Zurich, and Swiss International Air [LX] flight 16 from Zurich to New York-

   JFK arriving on 17 August 2017.  [A-824].  On August 17, 2017, FDBVBA's

Belgian customs broker, AWDC of Antwerp, submitted Export Filing No. 17BEE0000034643150 to Belgian customs. [A-823].

2. On or about September 6, 2017, FDBVBA sold to FDI polished diamonds purporting to weigh 585.47 carats. FDBVBA issued Commercial Invoice No. 111710305P, dated 6 September 2017, for the sale, at US$907.71 per carat, for a total invoice amount of US$531,438.84. [A-826]. Customs broker AWDC submitted Belgian Export Filing No. 17BEE0000037860913, dated 7 September 2017, to Belgian Customs on behalf of FDBVBA. [A-827]. That same day, Malca-Amit issued House Air Waybill No. 4558172, for a shipment 585.47 carats of polished diamonds on board Swiss Air flight 789 on 7 September 2017 from Brussels to Zurich, and Swiss International Air [LX] flight 16 from Zurich to New York-JFK arriving on 8 September 2017. [A-828].

3. The third sale on which BOI-A's claim is based occurred on November 10, 2017, when FDBVBA sold to FDI a quantity of 1,747.45 carats of polished diamonds. On that date, FDBVBA issued Commercial Invoice No. 111710384P, at a sale price US$325.76 per carat, for a total invoice amount of US$569,253.36. [A-830]. Customs broker AWDC submitted Export Filing No. 17BEE0000048448814, dated 10 November 2017, to Belgian Customs on behalf of FDBVBA. [A-831]. That same day, Malca-Amit issued House Air

Waybill No. 4566390, for a shipment 1747.45 carats of polished diamonds on board Swiss Air flight 789 on 10 November 2017 from Brussels to Zurich, and Swiss International Air [LX] flight 16 from Zurich to New York-JFK arriving on 12 November 2017.  [A-832].

On the commercial invoice for each of the three shipments, FDBVBA directed Debtor FDI to "PAY TO BANK OF INDIA, NEW YORK FED ABA NO. 026005458 (BKIDUS33) FOR ACCOUNT NO 12121503325500 OF BANK OF INDIA, ANTWERP (BKIDBE22)" with the additional notation that the payment was for the ultimate credit of FDBVBA.  The invoices also stated that "The amount of this invoice should be paid directly to the Bank of India, Antwerp Branch, in whose favour we endorse this invoices, by way of pledge."  [A-822, A-826, A-830].  FDBVBA instructed that payment should be made "directly" to BOI-A in accordance with Article 16 of the General Credit Conditions whereby BVBA granted to BOI-A a right of pledge over all Receivables of BVBA.  [A-815].[7]

---

[7] Over the course of the relationship between FDBVBA and BOI-A under the Pledge of Receivables Agreement, FDBVBA pledged to BOI-A no fewer than seven (7) invoices issued in connection with sales by FDBVBA to Debtor FDI, including the three that are the subject of the instant Proof of Claim.  For the other four pledged invoices, each of which bore the exact same payment instruction to BOI-A's account pursuant to the General Credit Conditions incorporated into the credit facility agreement, FDI duly made payment to the BOI-A account designated in the invoices.  [A-772-773, A-835-849].  FDI's acceptance of those invoices over the parties' course of dealing therefore established its obligation to make payment directly to BOI-A on each pledged invoice.

The rights of UBI to receive payment directly from FDI similarly vested more than several months in advance of the Petition Date, when FDBVBA made three sales of various quantities of diamonds to FDI.

1. On or about 6 October 2017, BVBA sold to Debtor FDI polished diamonds purporting to weigh 1,803.93 carats, issuing Commercial Invoice No. 111710337P, at a sale price of US$476.90 per carat, for a total invoice amount of US$860,291.45.  [A-745].  Customs broker AWDC submitted Export Filing No. 17BEE0000042814968, dated 6 October 2017, to Belgian Customs on behalf of FDBVBA.  [A-746].  Malca-Amit issued House Air Waybill No. 4562195, dated 6 October 2017, for the shipment of the goods covered by the sale on board Swiss Air flight 789 departing on 6 October 2017 from Brussels to Zurich, and Swiss International Air [LX] flight 16 from Zurich to New York-JFK arriving on 8 October 2017. [A-747].

2. On or about 10 November 2017, FDBVBA sold to FDI polished diamonds purporting to weigh 1,177.2 carats, issuing Commercial Invoice No. 111710388P, at a price of US$580.14 per carat, for a total invoice amount of US$682,938.88.  [A-749].  AWDC submitted on behalf of FDBVBA Export Filing No. 17BEE0000048600163, dated 13 November 2017, to Belgian Customs.  [A-751].  Malca-Amit issued House Air Waybill No. 4566434, dated 13 November 2017, for the shipment of 1,177.2 carats of polished diamonds on

board Swiss Air flight 789 departing on 13 November 2017 from Brussels to
Zurich, and Swiss International Air [LX] flight 16 from Zurich to New York-
JFK arriving on 14 November 2017.  [A-752].

3. On or about November 29, 2017, FDBVBA sold to Debtor FDI polished
   diamonds purporting to weigh 3,635.13 carats, and issued Commercial Invoice
   No. 111710426P, at a price of US$446.98 per carat, for a total invoice amount
   of US$1,624,844.30.  [A-754].  On that same date, Malca-Amit issued Global
   Shipping Instruction No. 4569142, for the door to door shipment of 3,635.13
   carats of polished diamonds from BVBA to Consignee FDI.  [A-755].

   On the commercial invoice for each of the three shipments, FDBVBA
directed Debtor FDI to make payment "to the credit of Union Bank of India (UK)
Ltd." at the same numbered account at Bank of America.  BVBA directed payment
to UBI in accordance with the existing Pledge of Receivables Agreement whereby
BVBA granted to UBI a right of pledge over all Receivables of BVBA.[8]

   BOI-BDB is also a commercial lender. BOI-BDB took part in a consortium
loan made to FDIPL. As security for the consortium loan, FDIPL granted BOI-

---

[8] Over the course of the relationship between FDBVBA and UBI under the Pledge of
Receivables Agreement, BVBA pledged to UBI at least six (6) invoices issued in connection
with sales by BVBA to Debtor FDI, including the three that are the subject of the instant Proof of
Claim.  For the other three pledged invoices, each of which bore the exact same payment
instruction to UBI's account pursuant to the Pledge Agreement, FDI duly made payment to the
UBI account designated in the invoices.  FDI's acceptance of those invoices therefore established
its obligation to make payment directly to UBI.  [A-720, A-741-743].

BDB the direct right of payment from the Debtor for eight (8) invoices for which the Debtor originally owed payment to FDIPL. The invoices are clear that the Debtor is the obligee who required to make payments to FDIPL. This was all done prior to the filing of the Bankruptcy and creation of the Bankruptcy Estate.  [A-654-709].

FDI's acceptance of each of the aforementioned invoices created a direct right of recovery by the respective Banks against FDI.  The Trustee and Bankruptcy Court mistakenly treated the Banks' claims solely as debts for amounts owed by FDI to the various Firestar Borrowers and then merely transferred to the Banks.  The Banks' claims do not result from not mere transfers of rights of payment.  Rather, the claims instead are based upon agreements whereby FDI agreed to make payment on the various invoices issued by the Firestar Borrowers directly to the Bank Appellants in consideration of the Banks' extending credit to the Firestar Borrowers.

While the underlying transactions among FDI and the Firestar Borrowers may have been part of the massive Modi fraud, this does not change the outcome. There is no contention that the Bank Appellants were in any way complicit in the fraud; rather they were victims of the fraud.  Accordingly, the Bankruptcy Court should have acknowledged that, if the massive fraud that forms the basis of the Trustee's objections to the Banks' claims actually involved the sales to which the

26

invoices at issue relate, then the Banks were innocent victims of the fraud, no less

than that suffered by any of the other creditors that submitted proofs of claim.  The

same is also true for Punjab National Bank (PNB), which submitted a proof of

claim for over $1 billion and is far and away the largest creditor in the bankruptcy.

Penalizing the Banks for falling victim to the same conspiracy that rendered PNB

the largest creditor in these proceedings, notwithstanding the alleged involvement

of certain PNB employees in the fraud [A-274-280], would work precisely the type

of inequities the Bankruptcy Code was intended to prevent.

## C. THE BANKRUPTCY COURT ERRED IN NOT APPLYING THE HOLDING OF THE DISTRICT COURT DECISION OF *IN RE ENRON* (*ENRON II*) WHERE THE BANKS WERE GOOD FAITH CREDITORS FOR VALUE AND NEVER HELD ANY PROPERTY OF THE DEBTOR'S ESTATE

The Bankruptcy Court treated the Banks as if they were speculators in trade

claims rather than good faith financiers of pre-petition commercial transactions.

Consequently, the Court erroneously declined to apply the holding of *In re Enron

Corp.*, 379 B.R. 425 (S.D.N.Y. 2007 (*Enron II*), which makes clear why the

application of Bankruptcy Code Section 502(d) to good faith holders of claims is

improper.  Judge Scheindlin held in *Enron II* that a disability that has attached to a

creditor is a personal disability that will not necessarily follow a claim.  379 B.R.

at 443-44.  Rather than simply concluding that a claim will be subject to

disallowance when it arises in connection with a party that may be have engaged in

fraudulent or other conduct that would entail a recovery by the bankruptcy estate, the court should examine the extent to which disallowance is a personal disability and whether common or state law governing the rights of the ultimate claimant should be considered.  *Id.* at 445.

### 1.  The Applicability of the *Enron II* Analysis

*Enron II* involved an adversary proceeding brought by the estate of the debtor against the transferee of claims that arose under a credit facility between the debtor and Citibank, as transferor.  The debtor's estate sought declarations that the transferee's claims were subject to both equitable subordination under Section 510(c)[9] of the Bankruptcy Code and disallowance under Section 502(d), based on alleged inequitable conduct of Citibank, as well as upon Citibank's alleged receipt and refusal to return certain avoidable transfers.  On appeal of the denial of the motions of the transferee claimant to dismiss the adversary proceedings, Judge Sheindlin concluded that conduct giving rise to both equitable subordination and Section 502(d) disallowance were personal disabilities that did not necessarily run with the claim.

Judge Sheindlin began her analysis of the disallowance issue by reviewing the language of the statute and stating that "[t]he twin aims of section 502(d) are

---

[9] The Trustee initially wrote to the Banks to demand withdrawal of their claims on both equitable subordination and disallowance grounds, but moved in the Bankruptcy Court only on 502(d) disallowance grounds.

'to assure an equality of distribution of the assets of the bankruptcy estate' and 'to have the coercive effect of insuring compliance with judicial orders.'" 379 B.R. at 435 (quoting *In re Davis*, 889 F.2d 658, 661-62 (6th Cir. 1989)). She concluded that "[t]he language and structure of the statute is plain, and requires the entity that is asserting the claim be the same entity (*i.e.,* 'such entity') that is liable for the receipt of and failure to return property". 379 B.R. at 443. The purpose of 502(d), in compelling the return of property improperly transferred to the transferor,

> would not be served if a claim in the hands of a claimant could be disallowed even where that claimant never received the preference to begin with, and as a result, could not be coerced to return it. It seems implausible that Congress would have intended such a result. This is especially so given that section 502(d) was not intended to punish, but rather "to give *creditors* an option to keep *their* transfers (and hope for no action by the trustee) or to surrender *their* transfers and *their* advantages and share equally with other creditors." Applying section 502(d) to purchasers of claims would be punitive because they have no option to surrender something they do not have, which means they have not personally obtained any advantage that they could surrender.

*Id.* at 443-44 (quoting *Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1239 (1st Cir. 1997)). She determined that "Congress's intent in enacting the equitable subordination and disallowance statutes was to create personal disabilities, and that Congress did not intend that those disabilities would travel to all transferees". *Id.* at 446. The nature of the transaction under which the ultimate claimant had acquired its claim should be examined before concluding that the claim should be disallowed. *Id.* at 445. Two examples of transactions

29

where the disability arising from the transferor's actions would not follow the claim were sales of claims and where a party was a holder in due course of a negotiable instrument.

Judge Sweet followed Judge Scheindlin's holding in the case of *Longacre Master Fund, Ltd. v. ATS Automation Tolling Systems, Inc.*, 456 B.R. 633 (S.D.N.Y. 2011), *vacated in part on other grounds*, 496 Fed. App'x 135 (2d Cir. 2012). The transferee of a claim against a bankruptcy debtor had filed suit against the transferor alleging breach of contract for transferring an impaired claim. Judge Sweet applied the holding of *Enron II* to conclude that "disallowance is a personal disability of a claim transferor which has received and refused to return avoidable and recoverable transfers, and since such a personal disability does not inhere in the claim itself", the disability did not run with the claim after it was sold. 456 B.R. at 641. The district court consequently dismissed the counts of the complaint that sought recovery for the transfer of an impaired claim.[10] The Bankruptcy Court's treatment of Judge Scheindlin's holding as an outlier therefore was in error, particularly where the rationale expressed by Judges Scheindlin and Sweet

---

[10] The Second Circuit vacated Judge Sweet's holding not because it disagreed with his conclusion that disallowance was a personal disability that did not run with the claim, but rather that he interpreted the meaning of "impairment" in the parties' contract of transfer too narrowly. That the estate had objected to the claim was sufficient in that case to constitute an impairment. 496 Fed. App'x at 138.

for not holding that any disabilities were transferred fully applies to the claims of the Bank Appellants in this case.

### 2. The Bankruptcy Court's Misplaced Rejection of *Enron II* in Favor of *KB Toys II* Led It to Conduct a Flawed Equitable Assessment of the Banks' Claims

Due to its parochial adoption of *KB Toys II* and rejection of *Enron II*, the Bankruptcy Court performed only a cursory review of the transactions under which the Bank Appellants came to hold their rights of payment from the Debtor.  The full nature of the transactions is set out in detail in Part B above, and makes clear that the Banks were not simple assignees of distressed claims against the Debtor's estate.  To the contrary, each of the Banks were named as the direct payees on the various commercial invoices issued to the Debtor that form the bases of their claims.  The Firestar Borrowers named the Banks as payees in a commercial lending transaction that occurred in the ordinary course of business, in which the Banks extended financing to the Firestar Borrowers in connection with the sales of diamonds reflected in the commercial invoices.  Each invoice called for payment approximately five months after the underlying sale, consistent with the international wholesale diamond trade.

Consequently, the Banks' extension of funds to the Firestar Borrowers was the means by which the underlying sales were financed, and rendered the Banks both secured creditors of the Firestar Borrowers, ***AND*** direct unsecured creditors

31

of Debtor FDI.  The debts of FDI to the Banks therefore arose simultaneously with the sale and shipment of the diamonds.  The Banks' extension of financing, the Firestar Borrowers' promises of payment of interest on the funds, and FDI's acceptance of the commercial invoices calling for direct payment to the Banks constituted reciprocal consideration for the transactions.  In its haste to disallow the Banks' claims, however, the Bankruptcy Court overlooked not only this mutual consideration, but also the direct benefit that inured to Debtor FDI from the Banks' advancing of funds to the Firestar Borrowers.  Instead of evaluating the true nature of the Banks' claims, the court below analyzed the disallowance issue as if the Banks were post-petition speculators in trade claims.  Indeed, the Bankruptcy Court's decision justified disallowance based on concerns which apply exclusively to post-petition claims trading—such as concerns about the transferees of claims "washing" the disabilities held by the transferor.  *See In re Enron II.*, 379 B.R. at 447 n. 110 ("Citibank asserts that the majority of the transfers that were before the Bankruptcy Court were made pursuant to credit-default swap contracts that were executed *pre-petition*. . .  Accordingly, the claims washing concern simply would not apply to those types of transfers." (Emphasis in original)).

There has been no allegation that any of the Bank Appellants were complicit in the massive fraud forming the basis of the Trustee's application for disallowance.  Indeed the Banks were defrauded by means of the very transactions

giving rise to their claims.  Accordingly, none of the rationales for disallowing a

claim based on the actions of the transferor would be served by holding the

misconduct of the Firestar Borrowers against the Claimants.  Moreover, the Banks'

rights to payment from the Debtor were fully vested **_prior_** to the commencement of

these bankruptcy proceedings, when they agreed to finance what they reasonably

believed were legitimate sales to the Debtor.  The Banks agreed to provide

financing to the Firestar Borrowers in consideration of FDI's acceptance of the

commercial invoices issued by the Borrowers directing that the Debtor make

payment to the Banks.  FDI consequently was not merely a passive party whose

obligation to perform was transferred without its participation.  Rather, the Debtor

derived a direct benefit as part of the related transactions where it (1) received

goods that were sold and (2) accepted commercial invoices directing payment be

made to the Claimants.

Under the Bankruptcy Court's flawed analysis, the Bank Appellants

"'voluntarily choose to take part in the bankruptcy process' and are aware of the

risks associated therein".  615 B.R. 161, 170 (quoting *KB Toys II*, 736 F.3d at 3253

n.8).  As stated above, however, such analysis treats the Banks as post-petition

speculators in trade claims rather than good faith financiers of commercial

transactions who acquired their rights to payment well in advance of and by way of

transactions independent from any bankruptcy proceedings.  Unaware of the Modi

fraud, which was not revealed to the public until after the beginning of 2018, the Bank Appellants extended their financing in the ordinary course of business in 2017 with no knowledge or indication that their rights to receive direct payment on the commercial invoices might be compromised by the complicity of the Firestar Borrowers and Debtor FDI in the massive fraudulent conspiracy.  Contrary to the Bankruptcy Court's unfounded assertion, the Banks had no opportunity to "take into account possible claim defenses when they negotiate[d] the terms of their assignments", 615 B.R. at 170, for the simple reason that they did not take pure assignments of distressed claims against a bankrupt estate.  As good faith financiers of commercial transactions with no knowledge of any fraud, they were in the same position of every other creditor of the Debtor FDI.[11]

## **CONCLUSION**

For the foregoing reasons, the Bankruptcy Court's erroneous disallowance of the claims of the Bank Appellants should be reversed.

Respectfully submitted,

Dated:        September 21, 2020

---

[11] Oddly, the Trustee made no attempt to seek disallowance of the claims of Punjab National Bank (PNB), who has been identified as the largest creditor of the Debtors, despite the alleged direct involvement of certain employees of PNB in the massive Modi fraud.  [A-274-280].  To the extent PNB is only an indirect creditor of the United States debtors based upon its being victimized by the Firestar International group entities in India, its apparent immunity from disallowance claims certainly undermines the contentions of the Trustee and the Bankruptcy Court that permitting the Bank Appellants to maintain their claims as general unsecured creditors in inequitable.

New York, NY

**HILL RIVKINS LLP**

/s/ *John J. Sullivan*

John J. Sullivan
jsullivan@hillrivkins.com
45 Broadway, Suite 1500
New York, New York 10006
Tel.: 212-669-0600
Fax: 212-669-0698
*Attorneys for Union Bank of India
(UK), Ltd.; Bank of India (London
Branch); Receivers of Firestar
Diamond BVBA on behalf of Bank
of India(Antwerp Branch)*

**CONDON & FORSYTH LLP**

/s/ *Joseph E. Czerniawski*

Joseph E. Czerniawski
Matthew D. Emery
7 Times Square, 18th Floor
New York, New York 10036
Tel:  (212) 894-6824
Fax:  (212) 370-4453

*Attorneys for Bank of India, Bharat
Diamond Bourse Branch*

# ADDENDUM

## 11 U.S.C. § 502—Allowance of claims or interests

**(a)** A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

**(b)** Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that-

**(1)** such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

**(2)** such claim is for unmatured interest;

**(3)** if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;

**(4)** if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;

**(5)** such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a) of this title;

**(6)** if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds--

**(A)** the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of--

**(i)** the date of the filing of the petition; and

**(ii)** the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

**(B)** any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

**(7)** if such claim is the claim of an employee for damages resulting from the

36

termination of an employment contract, such claim exceeds--

(**A**) the compensation provided by such contract, without acceleration, for one year following the earlier of--

(**i**) the date of the filing of the petition; or

(**ii**) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(**B**) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;

(**8**) such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or

(**9**) proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2), or (3) of section 726(a) of this title or under the Federal Rules of Bankruptcy Procedure, except that a claim of a governmental unit shall be timely filed if it is filed before 180 days after the date of the order for relief or such later time as the Federal Rules of Bankruptcy Procedure may provide, and except that in a case under chapter 13, a claim of a governmental unit for a tax with respect to a return filed under section 1308 shall be timely if the claim is filed on or before the date that is 60 days after the date on which such return was filed as required.

(**c**) There shall be estimated for purpose of allowance under this section--

(**1**) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

(**2**) any right to payment arising from a right to an equitable remedy for breach of performance.

(**d**) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 542, 550, or 553  of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i). 542, 543, 550, or 553 of this title.

(**e**)(**1**) Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or

contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that--

   (**A**) such creditor's claim against the estate is disallowed;

   (**B**) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution; or

   (**C**) such entity asserts a right of subrogation to the rights of such creditor under section 509 of this title.

(**2**) A claim for reimbursement or contribution of such an entity that becomes fixed after the commencement of the case shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) of this section, the same as if such claim had become fixed before the date of the filing of the petition.

(**f**) In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and the order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

(**g**)(**1**) A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

(**2**) A claim for damages calculated in accordance with section 562 shall be allowed under subsection (a), (b), or (c), or disallowed under subsection (d) or (e), as if such claim had arisen before the date of the filing of the petition.

(**h**) A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this title, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

(**i**) A claim that does not arise until after the commencement of the case for a tax entitled to priority under section 507(a)(8) of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under

subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

**(j)** A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case. Reconsideration of a claim under this subsection does not affect the validity of any payment or transfer from the estate made to a holder of an allowed claim on account of such allowed claim that is not reconsidered, but if a reconsidered claim is allowed and is of the same class as such holder's claim, such holder may not receive any additional payment or transfer from the estate on account of such holder's allowed claim until the holder of such reconsidered and allowed claim receives payment on account of such claim proportionate in value to that already received by such other holder. This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.

**(k)(1)** The court, on the motion of the debtor and after a hearing, may reduce a claim filed under this section based in whole on an unsecured consumer debt by not more than 20 percent of the claim, if--

**(A)** the claim was filed by a creditor who unreasonably refused to negotiate a reasonable alternative repayment schedule proposed on behalf of the debtor by an approved nonprofit budget and credit counseling agency described in section 111;

**(B)** the offer of the debtor under subparagraph (A)--

**(i)** was made at least 60 days before the date of the filing of the petition; and

**(ii)** provided for payment of at least 60 percent of the amount of the debt over a period not to exceed the repayment period of the loan, or a reasonable extension thereof; and

**(C)** no part of the debt under the alternative repayment schedule is nondischargeable.

**(2)** The debtor shall have the burden of proving, by clear and convincing evidence, that--

**(A)** the creditor unreasonably refused to consider the debtor's proposal; and

**(B)** the proposed alternative repayment schedule was made prior to expiration of the 60-day period specified in paragraph (1)(B)(i).

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Bankruptcy Rule 8015(h), Appellants certify that this Main Brief complies with the requirements of Bankruptcy Rule 8015, as Amended by Section II.D of the this Court's Individual Practices, as further amended by the Parties' So Order Stipulation of Consolidation and Briefing Schedule of August 10, 2020, in that the Brief has been prepared in Time Roman typeface, 14 point size, and consists of 8,488 words in those parts of the Brief subject to word count under Bankruptcy Rule 8015(g).

Dated:          September 21, 2020
               New York, NY

                                        **HILL RIVKINS LLP**

                                        /s/*John J. Sullivan*
                                        _____
                                        John J. Sullivan
                                        jsullivan@hillrivkins.com